UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| PETER VIDMAR, an individual,<br><br>Plaintiff,<br><br>v.<br><br>IDAHO POWER COMPANY, an Idaho corporation,<br><br>Defendant. | Case No. 1:19-cv-00475-REB<br><br>**MEMORANDUM DECISION AND ORDER RE:**<br><br>**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. 28)** |

Pending is Defendant's Motion for Summary Judgment (Dkt. 28), in which Defendant Idaho Power Company seeks dismissal of all the claims set forth in Plaintiff Peter Vidmar's First Amended Complaint (Dkt. 10). Having fully reviewed the record, heard oral argument, and otherwise being fully advised, the Court enters the following Decision and Order:

## BACKGROUND

Plaintiff Peter Vidmar was employed by Defendant Idaho Power Company ("IPC") for over 20 years as an engineer and Engineering Leader until his termination in January 2019. The circumstances of his termination are the focus of this lawsuit. His First Amended Complaint (Dkt. 10) alleges (1) IPC violated the Americans with Disabilities Act ("ADA") and the Idaho Human Rights Act ("IHRA") by engaging in unlawful disability discrimination; (2) IPC violated the Family Medical Leave Act ("FMLA"); and that (3) IPC is liable under Idaho law for negligent and/or intentional infliction of emotional distress.

IPC seeks summary judgment on each claim. Central to IPC's position is its contention that it did not engage in – and could not have engaged in – disability discrimination against Mr. Vidmar because he was not disabled and, even if he was disabled, IPC was not on notice of such

**MEMORANDUM DECISION AND ORDER RE: DEFENDANT'S MSJ – 1**

disability.  Vidmar's termination, IPC contends, only came after an outside investigator hired to look into an October 2018 incident concluded that Mr. Vidmar had violated IPC's core values of safety, integrity, and respect.  In that incident, the parties agree, Mr. Vidmar used a corded, electric-powered, drill while standing in water during the installation of a stream gage on the Snake River below the Hells Canyon dam.  Two other IPC employees were present.  The parties disagree whether the use of a corded drill was unsafe and whether such use violated IPC's Code of Business Conduct.

Following the event, IPC conducted both an internal safety investigation and then the separate external investigation.  When Mr. Vidmar spoke with investigators, he said he did not remember certain details.  Other details he did remember were not entirely consistent with the reports of the other onsite IPC employees.  Several days after Mr. Vidmar initially answered questions of the outside investigator, he followed up with her to supplement his answers, telling her that he had remembered additional details after their initial meeting.

In her report that is part of the summary judgment record, the external investigator Pamela Howland concluded that Mr. Vidmar violated the "safety" value of IPC's Code of Conduct by using a corded drill while standing in water, creating a risk of electrocution.  She further found that he violated the "integrity" value of the Code of Conduct by refusing to acknowledge that his actions had been unsafe and by changing his story during the investigation, signaling a lack of honesty.  Finally, as relevant here, she concluded that he violated the "respect" value of the Code of Conduct by treating coworkers unprofessionally both before and during the October 2018 work trip.

Relying in substantial part on the report prepared by Ms. Howland, IPC fired Mr. Vidmar in January 2019.  Mr. Vidmar alleges that IPC based the termination on two reasons: "(1) a

safety concern related to the Hells Canyon trip, and (2) Mr. Vidmar's compromised integrity." FAC ¶ 21 (Dkt. 10). IPC does not disagree with this description. However, Mr. Vidmar contends that the reasons for his termination were pretextual and that he was instead terminated because of a non-specific memory-related disability. IPC does disagree with these contentions.

Mr. Vidmar alleges that he reported worsening memory issues to various IPC personnel near the end of 2018 and that he sought medical attention for such issues in the same timeframe. *Id.* ¶¶ 13, 15, 17, 20, 22, 26. Such memory issues, he alleges, qualified him for protection under the ADA and, he further alleges, IPC's awareness of his memory issues created a duty to investigate his disability and engage in an interactive reasonable accommodation process with him. *Id.* ¶¶ 29, 30.

IPC responds that Mr. Vidmar has not put forth sufficient evidence for a jury to find that he is disabled and, even if he could meet that initial threshold, he has not put forth sufficient evidence for a jury to find that IPC was on sufficient notice of any such alleged disability such that IPC had any duties to respond under the ADA. Further, IPC contends that its decision to terminate Mr. Vidmar was made in good faith, for proper reasons. IPC also argues that Mr. Vidmar's FMLA claim and emotional distress claim are unsupportable. Finally, IPC contends that Mr. Vidmar's claims are "meritless" and he should be required to pay IPC's fees and costs in defending the lawsuit.

## LEGAL STANDARDS

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323 (1986).  It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  There must be a genuine dispute as to any *material* fact – a fact "that may affect the outcome of the case." *Id*. at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the court must not make credibility findings. *See id*. at 255.  Direct testimony of the non-movant must be believed, however implausible. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999).  On the other hand, the court is not required to adopt unreasonable inferences from circumstantial evidence. *See McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to a material fact. *See Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).  To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the non-moving party's case. *See Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in his favor. *See Devereaux*, 263 F.3d at 1076.  The non-moving party must go beyond the pleadings and show "by her . . . affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex*, 477 U.S. at 324 (internal quotation marks omitted).  However, the court is "not required to comb

**MEMORANDUM DECISION AND ORDER RE: DEFENDANT'S MSJ – 4**

through the record to find some reason to deny a motion for summary judgment." *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001).  Instead, the "party opposing summary judgment must direct [the court's] attention to specific, triable facts." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

## <u>DISCUSSION</u>

### 1. **Plaintiff's FMLA Claim Is Dismissed.**

Plaintiff concedes the entry of summary judgment in favor of IPC on his FMLA claim. Plf.'s Mem. in Opp'n to Def.'s MSJ 18 (Dkt. 32).  The claim alleging a violation of the Family Medical Leave Act will be dismissed with prejudice.

### 2. **Plaintiff's ADA and IHRA Claims Are Dismissed.**

IPC seeks summary judgment on Mr. Vidmar's ADA and Idaho Human Rights Act claims because Mr. Vidmar cannot establish that he was "disabled" at the time of his termination.  Even if Mr. Vidmar were disabled, IPC contends that he failed to provide IPC adequate notice of his disability and of the need for accommodation.  Finally, IPC contends that Mr. Vidmar cannot establish that he would not have been fired but for his alleged memory loss disability – in other words, IPC had legitimate, non-discriminatory, reasons to terminate his employment.

In response, Mr. Vidmar points to facts he contends are material and genuinely disputed, including as to his alleged disability and as to IPC's knowledge of his disability.  He argues that his claim must be analyzed under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–804 (1973), which requires the Court to apply a burden-shifting framework in disability discrimination cases under the ADA.  Under that framework,

> [T]he plaintiff must establish a prima facie case of discrimination. If the plaintiff succeeds in doing so, then the burden shifts to the defendant to articulate a

legitimate, nondiscriminatory reason for its allegedly discriminatory conduct. If the defendant provides such a reason, the burden shifts back to the plaintiff to show that the employer's reason is a pretext for discrimination.

*Vasquez v. County of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2003) (citing *McDonnell Douglas*, 411 U.S. at 802–805).

A prima facie case under the ADA requires proof: "(1) he is disabled within the meaning of the ADA; (2) he is a qualified individual able to perform the essential functions of the job with reasonable accommodation; and (3) he suffered an adverse employment action because of his disability." *Allen v. Pac. Bell*, 348 F.3d 113, 1114 (9th Cir. 2003). According to IPC, Mr. Vidmar cannot show he was disabled at the time of his termination, *i.e.*, he cannot show that as of January 24, 2019, he had "a physical or mental impairment that substantially limit[ed] one or more major life activities." 42 U.S.C. § 12102(1)(A). Even if he could show an "impairment," IPC argues that Mr. Vidmar cannot show he was "substantially limited" because of such an impairment. Among other things, IPC emphasizes that Mr. Vidmar "refused in discovery to specify which delineated 'major life activities' he relies upon" (Def.'s Mem. ISO MSJ 5 (Dkt. 28-1)) and that he admitted that he was able to perform the essential functions of his IPC job. Further, IPC points to evidence that Mr. Vidmar is able to perform the engineering job with a different employer he accepted after his termination from IPC, without any accommodation. Additionally, IPC emphasizes Mr. Vidmar's medical records contemporaneous to the time of his termination, which IPC says are evidence that Mr. Vidmar's cognitive skills were "within (or better than) the expected ranges," including for "memory," and that his medical providers placed no restrictions on him because of cognitive issues.

Mr. Vidmar responds that "major life activities" include the functional examples of "concentrating, thinking, communicating, and working" (42 U.S.C. § 12102(2)(A)) as well as

physiological examples such as "the operation of a major bodily function, including …

neurological, [and] brain … functions."  42 U.S.C. § 12102(2)(B).  He relies upon a report of Dr.

Craig Beaver, a certified neuropsychologist, who conducted a neuropsychological evaluation and

"diagnosed him with an unspecified neurocognitive disorder which substantially and negatively

impacted Mr. Vidmar during the course of events which gave rise to the termination of his

employment with IPC."  Plf.'s Mem. ISO Def.'s MSJ 4 (Dkt. 32).

Dr. Beaver examined Mr. Vidmar in May 2020, some 16 months after his termination.

Beaver Neuropsychological Exam. 1 (Dkt. 32-4).  Dr. Beaver concluded that "[f]ormal

neuropsychological testing is supportive of" Mr. Vidmar's having "reported increasing

difficulties with his memory," that Mr. Vidmar "demonstrated significant difficulties in

auditory/verbal memory," and that there was "evidence of mild difficulties with sustained

attention and concentration."  *Id.* at 9.  Dr. Beaver diagnosed an "underlying neurological

condition resulting in a decline in his neurocognitive functioning," with unclear etiology.  *Id.*

Dr. Beaver opined that "Mr. Vidmar's deficits in verbal/auditory memory provide an

alternative explanation for the concerns raised in [IPC's] investigative report as it relates to his

candor and accuracy in recalling prior events.  Mr. Vidmar, given his neurocognitive difficulties,

would have problems recalling prior incidences accurately and be prone to confusing details in

his recollections.  The detail and sequence of prior events would be potentially problematic for

him as it related to the events that led to his termination."  *Id.* at 9–10.

IPC discounts any evidentiary value of Dr. Beaver's report, contending that Dr. Beaver's

examination of Mr. Vidmar occurred so long after Mr. Vidmar's termination (more than 16

months later) that any findings or conclusions Dr. Beaver might have drawn cannot reliably

describe Mr. Vidmar's neurological functioning as of the time of his termination.  Second, and

relatedly, IPC argues that Dr. Beaver's conclusions are inconsistent with the findings of medical providers who examined Mr. Vidmar at a time closer to the date of his termination.

Separate from any finding made by Dr. Beaver, Mr. Vidmar relies upon other testimony that his memory issues substantially and negatively impacted his ability to work and his family life, at the time of his termination. In particular, he cites to his own testimony and his wife's testimony regarding the "extensive measures they took as a family to accommodate" his memory issues.

In considering and weighing the arguments on the issue of whether Plaintiff has put forth competent evidence that he was "substantially limited" in any "major life activities" as of his termination date, the Court must draw reasonable inferences in favor of Mr. Vidmar as the non-moving party and must take his testimony as true. In doing so, the Court acknowledges that IPC makes strong arguments for discounting Dr. Beaver's report. However, the Court is not persuaded that rejecting Dr. Beaver's report as a matter of law is appropriate under the circumstances. A reasonable jury could conceivably find that Dr. Beaver's report establishes that Mr. Vidmar was disabled – including by suffering a substantial limitation to a major life activity such as working or brain function – as of his termination date. The question of whether Dr. Beaver's conclusions and opinions can reasonably be assumed to have applied to the period nearly a year and a half earlier, when Mr. Vidmar was still employed by Idaho Power, is a genuine, material, disputed issue of fact on this record. That is particularly so, in that a reasonable jury could also conclude that Dr. Beaver's examination was more thorough than those of the medical providers who examined Mr. Vidmar at a point in time closer to the date of his firing.

Additionally, although Mr. Vidmar's evidence that he and his wife took "extensive

measures" to accommodate his alleged memory issues is refutable, the Court is persuaded such evidence also is sufficient reason to survive summary judgment on this particular prong of the *McDonnell Douglas* template.  In sum, there is a prima facie showing, albeit contested, that Mr. Vidmar was disabled as of his termination date and he has further shown that there is a genuine dispute of material fact on that point.

The Court's next task concerns whether Mr. Vidmar has put forth evidence that "he is a qualified individual able to perform the essential functions of the job with reasonable accommodation." *Allen*, 348 F.3d at 1114.  IPC does not directly challenge this element and Mr. Vidmar notes that a "qualified individual with a disability" is defined by statute as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  The parties agree that Mr. Vidmar did not require accommodation from IPC to perform the essential functions of his job – although he testified that he "self-accommodate[d] extensively in order to minimize the impacts of his memory issues on his job performance."  Mr. Vidmar thus offers competent evidence that this element is satisfied.

The Court must then turn to the final element – whether Mr. Vidmar "suffered an adverse employment action because of his disability." *Allen*, 348 F.3d at 1114.  The adverse employment action of Mr. Vidmar's firing is obvious and not contested, but Mr. Vidmar's claim that he was fired "because of" his alleged disability is strongly disputed by IPC.  Moreover, Mr. Vidmar contends that IPC subjected him to a separate adverse employment action by failing to engage in the interactive process and to reasonably accommodate his disability.  FAC ¶ 30 (Dkt. 10); Plf.'s Mem. in Opp'n to Def.'s MSJ 8 (Dkt. 32).

As to this final element, IPC contends Mr. Vidmar never requested accommodation from

IPC and that, in fact, Mr. Vidmar admitted he was able to perform the essential functions of his IPC job without accommodation from his employer (although, again, Mr. Vidmar said that he extensively "self-accommodated"). Mr. Vidmar, according to IPC, said only that he needed more "consideration" for his claimed inability to remember details of the incident, when asked to recall them in the investigations into his alleged misconduct. Further, IPC contends Mr. Vidmar's claim presents a Hobson's choice for the company (albeit an inchoate choice, given the facts of this case), in which IPC says that if it had forced an accommodation on Mr. Vidmar after he declined to request one, the company would risk incurring a "regarded as" disability claim from Mr. Vidmar under 42 U.S.C. § 12102(1)(C).

Mr. Vidmar acknowledges the "general rule," at least in the Second Circuit, that "it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008). But he argues this Court should apply a recognized exception where an employer "knew or reasonably should have known that the employee was disabled." *Id.* As Mr. Vidmar notes, the *Brady* court explained that the exception is necessary in "situations where an employer is aware of a disability, but an employee is ignorant to his or her own need for accommodation." Plf.'s Mem. in Opp'n to Def.'s MSJ 9 (Dkt. 32) (citing *Brady*, 531 F.3d at 135). Indeed, the *Brady* court said that such a situation obtains when an employee's disability is "obvious or otherwise known to the employer without notice from the employee." *Brady*, 531 F.3d at 135 (citation omitted). Mr. Vidmar then draws upon an unpublished decision from the Ninth Circuit reversing summary dismissal of an ADA accommodation claim in which the plaintiff had not requested accommodation. *See Keenan v. Toys R US, Inc.*, 395 Fed. App'x 426 (9th Cir. 2010) (unpublished). In *Keenan*, the plaintiff:

**MEMORANDUM DECISION AND ORDER RE: DEFENDANT'S MSJ – 10**

[P]resented evidence that he had a diminished intellectual and emotional capacity that impeded his ability to interact with adults, and that his colleagues were generally aware that he was "childlike" and not functioning at an adult level. Additionally, Cox notified TRU when Keenan was hired that he should not interact with customers. When Keenan did have problems with customers, TRU habitually moved Keenan to the back of the store. This evidence creates a genuine dispute of fact that TRU knew or should have known Keenan suffered a disability affecting his customer interactions, which required accommodation.

*Id.* at 428.

In the Court's view, however, as to the claim that IPC subjected him to an adverse employment action by failing to engage in the interactive process, Mr. Vidmar fails to make a prima facie case. *Brady* and *Keenan* are inapposite, as Mr. Vidmar's alleged disability is not one that would have been sufficiently "obvious" to IPC or that impaired in some way his ability to recognize the need for, and to request, accommodation. This case simply does not present sufficient facts to impose a burden on IPC to initiate the interactive process when Mr. Vidmar did not request an accommodation. Even assuming a jury could find that Mr. Vidmar's reports of memory issues to various IPC personnel was enough to put IPC on notice of the existence and extent of an alleged disability (despite the lack of contemporaneous medical records substantiating such alleged disability) this particular claim fails. Mr. Vidmar did not request accommodation from IPC. He testified that he was able to perform his job without accommodation. On that record, as a matter of law IPC had no duty to engage in the interactive process.[1]

---

[1] To be clear, this paragraph constitutes the Court's analysis whether Mr. Vidmar has established, under the first step of the *McDonnell Douglas* framework, a prima facie case of discrimination, and not whether – at this point in the analysis – IPC has shown it is entitled to summary judgment on this issue. However, to rest the Court's conclusion in this paragraph on even firmer footing, the Court also holds that there is no genuine dispute of material fact with respect to whether Mr. Vidmar can show that IPC took an adverse employment action against him by failing to engage in the interactive process. For the same reasons he failed to make out his prima facie case, he also failed to establish a genuine dispute of material fact as to this issue.

The Court next turns to Mr. Vidmar's alternative claim that his termination constituted an actionable adverse employment action because it was based upon his alleged disability. IPC, however, says that the persons who made the decision to fire Mr. Vidmar (Tom Harvey and Tessia Park) knew nothing about even the possibility of such a disability. IPC acknowledges that Mr. Vidmar says that he told various IPC employees at different times that he had "forgot something" or "couldn't remember." But, IPC contends, "no person in this busy, multitasking society could reasonably be expected to infer a psychiatric impairment by anyone noting they 'forgot' a work task, details from a project weeks ago, or other mundane matters." Def.'s Mem. ISO MSJ 8 (Dkt. 28-1).

IPC further argues that the Idaho Human Rights Commission made a similar finding, rejecting Mr. Vidmar's disability claim on the ground that he could not show any alleged disability was a factor in his termination. Relatedly, and as discussed in more detail below, IPC argues that Mr. Vidmar cannot prevail on his ADA claim because he cannot overcome evidence in the record that he was terminated for independent, non-pretextual reasons that have nothing to do with his alleged disability.

In response, Mr. Vidmar highlights that the burden to show "an adverse employment action *because of* his disability" does not mean that he must show that his alleged disability was the only, sole, or exclusive cause of his termination. From there, he frames this issue as quintessential "competing narratives," *i.e.*, IPC's narrative that he was lawfully terminated based on the findings of the investigation detailed in the Howland report versus his own narrative that he was terminated because of his disability, based on his explanation that "what IPC labelled 'lying' was actually a manifestation of a disability, his memory issues, with no investigation into his memory issues or scientific basis to reject his disability-based explanation." Plf.'s Mem. in

**MEMORANDUM DECISION AND ORDER RE: DEFENDANT'S MSJ – 12**

Opp'n to Def.'s MSJ 13 (Dkt. 32).  He highlights specific conversations from November 2018 with his IPC supervisor Jeff Connor, and conversations in December 2018 during the safety investigation undertaken by IPC employees Mr. Duke and Mr. Taylor, and also in January 2019 with IPC Employee Representative Steve Atkins – in each of which he raised concerns about his memory issues.  Such conversations, he contends, create a genuine dispute of material fact as to whether IPC was aware of his alleged disability and terminated him because of it.

As to Mr. Vidmar's claim that IPC terminated him because of his alleged disability, the Court is satisfied that Mr. Vidmar has made out a prima facie case.  He has drawn a string of reasonable inferences together in such a way that a jury could conceivably be persuaded that IPC knew of his disability and that it was a factor in his termination.  He thus satisfies the first step of the *McDonnell Douglas* burden-shifting framework.  Accordingly, IPC must "articulate a legitimate nondiscriminatory reason for its allegedly discriminatory conduct" to counter his evidence.

IPC strives to carry this burden by outlining in significant detail the reasons for Mr. Vidmar's termination.  First, based on the report of its external investigator Ms. Howland, IPC decided that Mr. Vidmar had been dishonest in statements he made during its investigation and perceived dishonesty during an investigation is a legitimate, non-discriminatory reason for termination.  Additionally, IPC describes the multiple reasons for his termination that were unrelated to the conclusion of dishonesty (and to his alleged disability), *e.g.*, that Mr. Vidmar violated the company's "safety value" by "using a corded electric drill while standing in knee-deep water, directing [IPC employee] Sullivan to hold the cord out of the water, disregarding [fellow IPC employee] Thometz's safety concern about Vidmar's conduct, dismissing the same as 'a trust exercise,' and refusing to acknowledge the substantial danger of and accountability for

**MEMORANDUM DECISION AND ORDER RE: DEFENDANT'S MSJ – 13**

his conduct."  Def.'s Mem. ISO MSJ 14–15 (Dkt. 28-1).  IPC also contends that Vidmar violated

the company's "integrity value" in ways unrelated to the alleged memory lapses, including his

failure to act as a proactive safety leader; his disregard for his colleagues' safety and their raised

concerns; his ongoing refusal to acknowledge the danger his admitted actions posed to himself

and others; and his attempt to blame others for not doing a better job of stopping him from being

unsafe.  *Id.* at 15.  Finally, IPC says he violated the "respect value" of the company's Code of

Conduct in his interactions with other employees.

Arguably IPC's belief Mr. Vidmar was being dishonest has a connection to his alleged

memory issues, but such a connection and any significance Mr. Vidmar might attach to it does

not overcome IPC's argument that there was a non-discriminatory reason for his termination.

The other reasons for termination have no relation to the question of whether Vidmar had

cognitive memory issues.  In *toto*, there were multiple, justifiable, nondiscriminatory

justifications put forward by IPC as a basis for firing Mr. Vidmar.

As a result, the burden shifts back to Mr. Vidmar, under the *McDonnell Douglas*

framework, to show that IPC's reasons for terminating him were pretextual.  He must do so

"either directly by persuading the court that a discriminatory reason more likely motivated the

employer or indirectly by showing that the employer's proffered explanation is unworthy of

credence."  *Chuang v. University of California Davis*, 225 F.3d 1115, 1123 (9th Cir. 2000).

Moreover, in judging whether an employer's proffered justifications are "false," it is not

important whether they are *objectively* false.  Rather, courts "only require that an employer

honestly believed its reason for its actions, even if its reason is 'foolish or trivial or even

baseless.'"  *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054 (9th Cir. 2002) (quoting *Johnson*

*v. Nordstrom, Inc.*, 260 F.3d 727, 733 (7th Cir. 2001).

**MEMORANDUM DECISION AND ORDER RE: DEFENDANT'S MSJ – 14**

Mr. Vidmar argues that there is a genuine dispute of material fact surrounding "the reasonableness and honesty of Ms. Howland's conclusion … that Mr. Vidmar lied during the investigations."  Plf.'s Mem. in Opp'n to Def.'s MSJ 15 (Dkt. 32).  He says "there are facts on which a jury could conclude that IPC knew Mr. Vidmar was participating in the investigations as truthfully as his memory allowed but still terminated his employment based on his disability-impacted investigation participation."  *Id.*  But Mr. Vidmar does not persuasively support either of these assertions with citations in the record to "specific, triable facts," as required to survive summary judgment.  *See S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).  That is, he does not persuade the court that there are facts in evidence that undermine "the reasonableness and honesty" of any of Ms. Howland's conclusions.  Nor does he point to any specific facts that would tend to show IPC knew he was participating in the investigations "as truthfully as his memory allowed" but terminated him anyway for disability-related reasons.  He repeats his argument that IPC was on notice that he was "struggling with memory issues," and he says he acted in accordance with the advice of IPC Employee Representative Mr. Atkins when providing further details to Ms. Howland as he recalled them.  But neither of those facts raises a genuine dispute as to IPC's knowledge of the truthfulness or untruthfulness of Mr. Vidmar's participation in the investigations.

Mr. Vidmar also suggests that a jury could conclude that Ms. Howland "ignored contrary evidence in order to reach a predetermined, pretextual narrative that Mr. Vidmar was lying, as opposed to simply experiencing good faith difficulties remembering."  *Id.* at 16.  Ms. Howland found it "unlikely that Mr. Vidmar had a flashback that restored his memory.  Instead, it is more likely that he realized Mr. Thometz and Mr. Sullivan were going to be interviewed in the investigation and provided truthful information as to what happened while at Hells Canyon."

(Dkt. 46-19 at 6).  Mr. Vidmar faults Ms. Howland for lacking neuropsychological training and for not consulting with a neuropsychologist in concluding that he lied, which he says renders her conclusion "unsupported and pretextual in nature."  The Court cannot agree.  There is no precise formula for the qualifications of an investigator retained by an employer to conduct an investigation such as this.  Indeed, it is not required at all for such a third-party investigator to be involved.  Although there may be room for criticism from Mr. Vidmar, such criticism on these facts that the investigator was not a neuropsychologist, or did not consult a neuropsychologist, does not change what is otherwise a reasonable investigation.

Mr. Vidmar also suggests that Ms. Howland "got the facts inaccurate in surmising that Mr. Vidmar only changed his story when he learned that Mr. Thometz and Mr. Sullivan would be interviewed."  Plf.'s Mem. in Opp'n to Def.'s MSJ 16 (Dkt. 32).  He says that he was aware from the beginning of the first, internal safety investigation that his colleagues would be interviewed.  However, Ms. Howland's report does not suggest that Mr. Vidmar changed his story because he *learned* that his colleagues would be interviewed, as Mr. Vidmar argues – rather, she concluded that he may have "realized" they would be interviewed and Mr. Vidmar omits the next sentence from her report which makes that clear: "Once he was placed on administrative leave, he likely realized the severity of his conduct, that his version of the events contradicted those relayed by two co-workers, and that he needed to come up with a way to convey a more consistent story."  (Dkt. 46-19 at 6–7.)  Regardless of whether Ms. Howland's report is accurate or correct on this point, Mr. Vidmar has not called into question its reasonableness.  Nor has he pointed to any evidence suggesting that IPC (or, for that matter, Ms. Howland) did not honestly believe what she put in the report.

Next, Mr. Vidmar faults Ms. Howland for concluding that he lied "not based on any

documentable, demonstrably false representation" but rather because Ms. Howland described

that it "was a case of me asking a question and him giving an answer that I later concluded was

false …. [M]y credibility assessment and my determination that Mr. Vidmar was not honest was

based on the totality of the facts …. Mr. Vidmar's story just did not match any aspect of what

everyone else related to me."  Plf.'s Mem. in Opp'n to Def.'s MSJ 16 (Dkt. 32) (quoting

Howland Dep. 37:7–18, 66:19–67:8 (Dkt. 46-18)).  However, Mr. Vidmar overlooks critical

additional testimony surrounding each excerpt (although the testimony is nonetheless properly

cited).  Ms. Howland testified:

> [I]t wasn't a case of me asking him a question and him saying 'I don't remember.'
> It was a case of me asking a question and him giving an answer that later I
> concluded was false.  So it wasn't a case of him saying 'I don't remember.'  I
> reached my conclusion based on what he did remember and what he told me
> happened.
> ….
> [M]y credibility assessment and my determination that Mr. Vidmar was not honest
> was based on the totality of the facts, like, everything we talked about in our
> interview and everything that all the other employees told me too.  You know, it
> wasn't like I was looking for one discrepancy.  It was analyzing the whole thing to
> try to understand and piece together what had happened.  And Mr. Vidmar's story
> just did not match any aspect of what everyone else relayed to me.  So I'm saying
> it was not just an analysis of one comment or two.  It was the whole interview, and
> comparing that with what all the other witnesses said.

Howland Dep. 37:12–18, 66:19–67:8 (Dkt. 46-18).

Mr. Vidmar's argument seeking to discredit Ms. Howland's report does not rise to the

level, even with inferences drawn in his favor, that would permit a jury to find that the report was

unreasonable, dishonest, or pretextual.  Certainly Mr. Vidmar disagrees with the report, as is his

right.  But his argument does not establish that the investigation or the report was made in bad

faith or was pretextual.[2]  There is room for argument that an investigation could have been

---

[2] Mr. Vidmar also argues that "Mr. Duke and Mr. Taylor likewise determined that Mr. Vidmar was lying based solely on making a credibility determination when faced with

**MEMORANDUM DECISION AND ORDER RE: DEFENDANT'S MSJ – 17**

conducted in a different manner, or even by a person with a different background, but ultimately whatever path an investigation might follow, there would always be some reason to contend that it should be have been done differently, but that fact alone is not evidence of pretext.

Mr. Vidmar closes this portion of his argument with an assertion that his "protestations that he was truthful, and the conclusion of IPC that he was lying, constitutes an archetypal factual dispute that must be resolved by the jury." Plf.'s Mem. in Opp'n to Def.'s MSJ at 16–17 (Dkt. 32). On the facts of this case, the Court disagrees. The Court must not make credibility assessments on summary judgment, but this issue does not call on such an assessment to be made. Although Mr. Vidmar has criticized Ms. Howland's investigation and report, such criticism is only a possible means of attacking her credibility. Here, however, the nature of the criticism does not, under any reasonable measure, challenge the otherwise factually supported conclusion that *Ms. Howland's credibility assessment of Mr. Vidmar* was honestly held.

Turning to the other stated reasons for Mr. Vidmar's termination, he argues that each of the alleged Code of Conduct violations was pretextual. He contends that neither IPC nor Ms. Howland identified a specific safety rule that prohibited using a corded electric drill in water, and he cites a report from a master electrician opining that he operated the drill safely and adhered to proper safety protocols. The take-away, according to Mr. Vidmar, is that if his action in using the corded drill in water was not unsafe, then there was no safety violation and therefore, his refusal to take accountability for acting unsafely is not a legitimate violation of the "integrity" value. His argument in this regard, however, detours the question of whether IPC genuinely

---

conflicting factual accounts, but they both found that Mr. Thometz was not forthcoming with them." Plf.'s Mem. in Opp'n to Def.'s MSJ 16 (Dkt. 32). The Court sees no relevance in this argument, as there is a difference between a witness being "not forthcoming" and the subject of an investigation "lying."

*believed* there to have been a safety violation, which – even if incorrect – does not become, *ipso facto*, pretextual.  Finally, he cites testimony of his two colleagues on the Hells Canyon trip to challenge Ms. Howland's conclusion that he "bullied" them, thereby violating the core value of "respect."

After a careful review, the Court is satisfied that, as a matter of law, Mr. Vidmar has failed to establish a genuine dispute of material fact as to the objective reasonableness of his termination on safety grounds.  In relying on his expert's opinion that there was no safety violation and that IPC did not cite a specific rule or regulation he violated when using a corded electric drill in water, Mr. Vidmar focuses his argument too narrowly.  There may well be a genuine factual dispute as to whether his use of the drill was unsafe.  But what Mr. Vidmar has failed to do is call into question whether IPC honestly *believed* his use of the drill was unsafe. Even if IPC was wrong about whether such use was unsafe, if it terminated him because of an honestly-held belief that it was unsafe, and nothing else in the record suggests pretext, then the termination was not based on pretext.  The parties agree that just such a safety issue was raised onsite.  Mr. Vidmar does not suggest – nor could he do so credibly – that the safety *investigation* (as distinct from his ultimate termination, in part on safety grounds) was initiated as a pretext. More fundamentally, he has pointed to no facts whatsoever that a reasonable jury could rely on to find that IPC used the alleged safety violation or the following investigations as a pretext to terminate Mr. Vidmar because of any disability.  Nor has he explained how any evidence of record can be interpreted as showing that IPC did not honestly believe he had engaged in a safety violation.  Therefore, he has failed to carry his burden to show pretext under the final phase of the McDonnell Douglas framework, and summary judgment will be granted to IPC on his ADA claim.  Because Mr. Vidmar's challenge to the validity of his termination on safety grounds is

insufficient to raise a genuine issue of material fact, his argument that he did not violate IPC's "integrity" value must also fail and it will not be further analyzed.

As to IPC's terminating Mr. Vidmar for violation of its "respect" value, the Court also finds no evidence of pretext that would preclude summary judgment. Mr. Vidmar quotes testimony of his colleagues that on its face seems to undercut Ms. Howland's finding of "bullying" behavior. But Mr. Vidmar does not fully address Ms. Howland's findings in this regard. Her report said:

> Substantial evidence establishes Mr. Vidmar failed to treat his co-workers with respect both before and during the trip to Hells Canyon. Mr. Vidmar's treatment of Mr. Sullivan, who was new to the group and who was trying to assist in preparations for the trip by completing tasks for the team, was not respectful when he accused him of failing to be a team player. Mr. Kolowith, Mr. Rundberg, and Mr. Conner all believed Mr. Vidmar treated Mr. Sullivan unprofessionally in this incident. Mr. Rundberg and Mr. Kolowith reported that Mr. Vidmar has a long history of treating his co-workers disrespectfully.
>
> Mr. Vidmar's disregard for the safety concern raised by Mr. Thometz on-the-job while Mr. Vidmar was standing in the water using an electric drill further establishes a lack of respect. After Mr. Thometz, a long-time employee who has worked with Mr. Vidmar for over a decade, raised a concern over an observed safety issue, Mr. Vidmar largely ignored it and continued his work.
>
> Mr. Vidmar's treatment of Mr. Sullivan further shows a lack of respect insofar as he directed him to engage in unsafe conduct that likely violated the Safety Policy. This conduct potentially endangered Mr. Vidmar's life (and possibly Mr. Sullivan's, as well). Mr. Taylor noted that this is not the first time Mr. Taylor has addressed allegations that Mr. Vidmar bullied, or intimidated, a co-worker into violating a safety policy. Mr. Kolowith and Mr. Rundberg stated that Mr. Vidmar has a history of intimidating employees into doing things they are not comfortable with. Both Mr. Sullivan and Mr. Thometz reported to Mr. Taylor and Mr. Duke that they have seen Mr. Vidmar use bullying tactics to get people to perform work unsafely.
>
> Although Mr. Vidmar expressed concern and regret about his treatment of Mr. Thometz throughout the first interview with the investigator, Mr. Vidmar largely ignored any impact his conduct may have had on Mr. Sullivan. This further shows Mr. Vidmar's lack of respect for Mr. Sullivan who was new to the group and who had attempted to stand up to Mr. Vidmar during their pre-trip disagreements.

(Dkt. 46-19 at 8.)

Mr. Vidmar draws upon statements from Mr. Thometz that everyone got along fine and

he'd never seen Mr. Vidmar bully anyone, and Mr. Sullivan said he did not feel bullied.  Even taking such testimony as true, Mr. Vidmar has nonetheless failed to show a genuine dispute of material fact in light of the substantial other evidence Ms. Howland cited: three other colleagues "all believed Mr. Vidmar treated Mr. Sullivan unprofessionally," two of them "reported that Mr. Vidmar has a long history of treating his co-workers disrespectfully," Mr. Vidmar "ignored any impact his conduct may have had on Mr. Sullivan," and more.

Mr. Vidmar expresses disagreement with portions of Ms. Howland's investigation report, but most of the report remained unchallenged.  Although he might well argue that his positions as to the matters described previously in this decision are also grounds to support an argument that termination based upon an alleged violation of the IPC value of "respect" was also pretextual, the Court would not be persuaded for the same reasons described herein as to those arguments.

The "same standards apply under federal and Idaho law" for discrimination claims raised under the ADA and the Idaho Human Rights Act, *Harris v. Treasure Canyon Calcium Co.*, 132 F.Supp. 3d 1228, 1236 (D. Idaho Sept. 22, 2015).  Hence, the same analysis applies to Mr. Vidmar's alternate claim in his first cause of action for a violation of the IHRA.  Thus, the first claim in Mr. Vidmar's First Amended Complaint will be dismissed with prejudice as to both the ADA and the IHRA claim.

### 3.  Plaintiff's Emotional Distress Claims Are Dismissed.

IPC argues that Mr. Vidmar's emotional distress claims must be dismissed because they are "solely predicated upon his claims under the ADA and FMLA and therefore fail for the same reasons."  Def.'s Mem. ISO MSJ 19 (Dkt. 28-1).  Separately, it also argues that Mr. Vidmar falls short of establishing the elements for either his negligent infliction of emotional distress or his

intentional infliction of emotional distress claims.

Mr. Vidmar contends that his negligent infliction claim "remains viable based on IPC's violation of its statutory duties owed to him under the ADA." He does not argue that either his intentional infliction or negligent infliction claims can survive if untethered to his ADA and FMLA claims.

Mr. Vidmar alleges that "[b]y its actions detailed herein above, Defendant [IPC] has negligently and/or intentionally caused Mr. Vidmar to suffer extreme mental anguish and emotional distress which distress has resulted in physical manifestations including anxiety, insomnia, and depression." FAC ¶ 44 (Dkt. 10). Under Idaho law, both negligent and intentional emotional distress claims require the breach of a duty owed by the defendant to the plaintiff. *See Edmondson v. Shearer Lumber Prods.*, 75 P.3d 733, 740 (Idaho 2003) (requiring "wrongful conduct" to state an intentional infliction claim); *Frogley v. Meridian Joint School Dist. No. 2*, 314 P.3d 613, 624 (Idaho 2013) (requiring a breach of "a legal duty recognized by law" to state a negligent infliction claim). Mr. Vidmar's ADA and FMLA claims are dismissed as a result of this decision. Thus, he cannot show that IPC breached any legal duty to him based on his First Amended Complaint. His emotional distress claims must therefore fail, and they will be dismissed with prejudice.[3]

### 4. Defendant's Request to Brief Entitlement to Fees Is Moot.

Finally, IPC requests an opportunity to brief entitlement to an award of its fees for defending in this matter, on the basis that it believes Mr. Vidmar's suit is "meritless." Def.'s

---

[3] The Court need not and does not consider the parties' arguments as to the other elements of Mr. Vidmar's emotional distress claims. Because such claims are subject to dismissal due to the lack of a breached duty, any dispute as to the remaining elements is not material for purposes of summary judgment.

Mem. ISO MSJ 20 (Dkt. 28-1).  The ADA provides:

> In any action or administrative proceeding commenced pursuant to this chapter, the court or agency, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee, including litigation expenses, and costs, and the United States shall be liable for the foregoing the same as a private individual.

42 U.S.C. § 12205.  However, fee awards to prevailing defendants should be reserved for "exceptional circumstances," lest they have "a chilling effect on the filing of ADA lawsuits by plaintiffs."  *Peters v. Winco Foods, Inc.*, 320 F.Supp.2d 1035, 1037 (E.D. Cal. 2004), aff'd, 151 Fed. App'x 549 (9th Cir. 2005).  ADA defendants may accordingly receive attorneys' fees only "upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation." *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421 (1978).[4]

IPC may decide on its own whether to seek an award of attorney fees, and it does not need permission from the Court to seek to do so.  However, even recognizing that there might be additional proof put forward to support the right to an award of attorney fees, the Court on the present record would not be inclined to find that Mr. Vidmar's prosecution of this case was frivolous, unreasonable, or without foundation.  This does not seem to be a case of exceptional circumstances justifying an award of attorney fees to the Defendant.

## CONCLUSION

As described herein, IPC's Motion for Summary Judgment is granted.  Mr. Vidmar's First Amended Complaint, and all claims raised within it, is dismissed with prejudice.

---

[4] Although *Christiansburg* sets out the standard for awarding fees under Title VII, the same standards apply for fee awards under the ADA.  *See Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1154 (9th Cir. 1997).

## **ORDER**

Based on the foregoing, **IT IS HEREBY ORDERED** that Defendant's Motion for

Summary Judgment (Dkt. 28) is GRANTED.  Plaintiff's First Amended Complaint is

DISMISSED WITH PREJUDICE, in its entirety.  The Clerk's Office is directed to close the

case.


DATED: March 24, 2021

_____
Honorable Ronald E. Bush
Chief U.S. Magistrate Judge